# EXHIBIT B

| | | |
|---|---|---|
| **RETURN DATE: June 3, 2014** | : | **SUPERIOR COURT** |
| | : | |
| Vincent Bartold, | : | **JUDICIAL DISTRICT OF** |
| | : | **FAIRFIELD** |
| Plaintiff, | : | |
| | : | **AT BRIDGEPORT** |
| | : | |
| v. | : | |
| | : | |
| Wells Fargo Bank, N.A., | : | |
| | : | |
| Defendant. | : | **May 12, 2014** |

## COMPLAINT

Plaintiff Vincent Bartold ("plaintiff"), by and through his undersigned attorneys, hereby files this Complaint against Wells Fargo Bank, N.A. ("defendant"), and in support thereof, alleges and states as follows:

### COUNT I: VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-110B

1.     Plaintiff Vincent Bartold ("Mr. Bartold") is a natural person residing at 260 Rockwell Avenue in Stratford, Connecticut.

2.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association conducting business in Connecticut, with its principal corporate offices located in San Francisco, California.

3.     At all relevant times herein, Wells Fargo has been engaged in trade and commerce in Connecticut.  Wells Fargo's trade and commerce encompasses originating and servicing residential mortgage loans, including Home Equity Conversion Mortgage loans, i.e., federally insured reverse mortgages.  Originating and servicing residential mortgage loans is part of the primary trade or commerce of Wells Fargo.

4.     Wells Fargo originated Mr. Bartold's Home Equity Conversion Mortgage reverse

mortgage loan, and at all relevant times herein, was the servicer of Mr. Bartold's reverse mortgage loan.

5.     A Home Equity Conversion Mortgage loan (HECM) is a reverse mortgage that is federally insured by the Department of Housing and Urban Development (HUD) and subject to the Department's regulations promulgated in accordance with 12 U.S.C. § 1715z-20 and found at 24 C.F.R. § 206 (hereinafter "HUD regulations").

6.     A HECM reverse mortgage enables older homeowners to convert the equity in their home to cash payments without having to move out or make monthly loan payments. Borrowers pay monthly insurance premiums, and HUD guarantees that the lender will be repaid up to specified limits. A HECM reverse mortgage typically does not mature or become due until the mortgagor dies, sells the property, or moves out.

7.     HUD regulations provide for five payment plans through which a reverse mortgage borrower can elect to receive their cash payments:  (1) tenure; (2) term; (3) line of credit; (4) modified tenure; and (5) modified term.

     a.   Under a tenure plan, "equal monthly payments are made by the mortgagee to the mortgagor until the loan becomes due so long as the mortgagor continues to live in the property."  24 C.F.R. § 206.19 (b).

     b.   Under a term plan, "equal monthly payments are made by the mortgagee to the mortgagor for a fixed term of months chosen by the mortgagor." 24 C.F.R. § 206.19 (a).

     c.   Under a line of credit payment option, payments are made at the request of the mortgagor so long as the amount does not exceed certain payment limits.  24 C.F.R. § 206.19 (c).

    d. A "modified tenure" plan combines a tenure plan that provides for equal monthly payments as long as the mortgagor lives in the property, pursuant to 24 C.F.R. § 206.19 (b), with a line of credit that the mortgagor can access on demand. 24 C.F.R. § 206.17 (a).

    e. A "modified term" plan combines a term plan, pursuant to 24 C.F.R. § 206.19 (a), with monthly payments for a fixed term with a line of credit that the mortgagor can access on demand. 24 C.F.R. § 206.17 (a).

8.    The payment plan a borrower chooses is specified in the original loan documents. 24 C.F.R. §§ 206.17 (a), 206.27(b).

9.    The payment plan may be changed only by the borrower in accordance with 24 C.F.R. § 206.26 and the loan documents.

*Mr. Bartold obtains a HECM reverse mortgage loan with a "Modified Tenure" payment plan from Wells Fargo, providing for monthly payments of $600 for life.*

10.    Mr. Bartold is the owner of record of a residence at 260 Rockwell Avenue in Stratford, Connecticut (hereinafter "the home").

11.    Mr. Bartold's parents purchased the home in 1958, and Mr. Bartold has lived in the home for approximately the last 30 years.

12.    In 2005, Mr. Bartold was deeded the home by his mother. At that time, the home was unencumbered by any mortgage liens.

13.    Mr. Bartold had never previously owned real property and had never applied for or obtained a home mortgage loan.

14.    Mr. Bartold is elderly, has disabilities, and lives on a fixed income consisting solely of monthly Supplemental Security Income (SSI) benefits paid at a rate set by the Social

Security Administration.

15.     In 2009, when Mr. Bartold was 67 years-old, he saw a television commercial advertising a "reverse mortgage" home loan.

16.     As Mr. Bartold understood it, a reverse mortgage loan could enable him to convert the substantial equity he had in the home to monthly cash payments without having to move out or make monthly loan payments.  Mr. Bartold understood that he could receive these cash payments as long as he was alive and remained living in the home.

17.     Mr. Bartold desired to live independently as long as possible.  He was interested in a reverse mortgage because he believed the monthly payments he would receive would enable him to afford to remain living in his home long-term, which would otherwise be cost prohibitive given his fixed income.

18.     Mr. Bartold's SSI benefits do not increase except by modest increments to adjust for inflation, so his future income would remain stagnant.  It was thus important to him that the monthly payments he received through a reverse mortgage continue so long as he was alive and remained living in the home, i.e., that they be paid on a "tenure" plan that would continue throughout his life rather than a "term" plan that would cap the number of months or years he received payments.

19.     In the early summer of 2009, Mr. Bartold applied for and was approved for a HECM reverse mortgage based on an appraisal of $185,000 of the home through Webster Bank, and a closing was scheduled for late July 2009.

20.     Upon information and belief, the reverse mortgage Mr. Bartold was approved for through Webster Bank provided for monthly payments on a "tenure" plan.

21.     Shortly before closing, a real estate agent advised Mr. Bartold to contact other

4

lenders to see if they could offer more favorable loan terms.

22.     Mr. Bartold contacted Wells Fargo, and in late July of 2009 a mortgage broker named James McMinn, who was an agent or employee of Wells Fargo, met with Mr. Bartold in his home.

23.     Mr. McMinn told Mr. Bartold it could offer him a HECM reverse mortgage with a 1/2 % lower interest rate and larger monthly payments than Webster Bank, that it could use Webster Bank's appraisal of $185,000 of the home, and that closing on the loan could occur within one month, in late August 2009.

24.     Based on Wells Fargo's representations, Mr. Bartold agreed to obtain a reverse mortgage from Wells Fargo rather than follow through on his scheduled closing with Webster Bank.

25.     Wells Fargo did not schedule a closing until nearly three months later, for October 26, 2009.

26.     Mr. Bartold repeatedly contacted Wells Fargo to ask that the closing occur quickly.  Wells Fargo did not offer any explanation for its refusal to schedule a closing in August 2009, as agreed.

27.     As a result of Wells Fargo's delay, Mr. Bartold had to obtain a second home appraisal, which showed a decreased value of $175,000, $10,000 less than the appraisal from Webster Bank that Wells Fargo had agreed to use.

28.     Upon information and belief, this lower appraised value of the home decreased the monthly payment amount on the reverse mortgage loan that Mr. Bartold would otherwise have received.

29.     At the closing on the HECM reverse mortgage on October 26, 2009, Mr. Bartold

entered into a "Home Equity Conversion Loan Agreement" with Wells Fargo (hereinafter "the Loan Agreement"). A copy of the Loan Agreement is attached hereto as Exhibit A.

30.     At closing, **Mr. Bartold** also executed Exhibit 1 to the Loan Agreement, the "Home Equity Conversion Mortgage Payment Plan" (hereinafter "the Payment Plan"). (See Exhibit A).

31.     In the Loan Agreement, Wells Fargo agreed to make equal monthly payments as a loan advance to **Mr.** Bartold in accordance with the Payment Plan. (See Exhibit A, Sec. 2.5). The Loan Agreement states "Monthly payments under the tenure payment plan . . . shall continue until the loan becomes due and payable as provided in the Loan Documents." (Id., at Sec. 2.54.)

32.     In the Payment Plan, **Mr.** Bartold elected to receive his payments from Wells Fargo under the Loan Agreement on a "modified tenure" plan, with a payment amount of $600 per month. (Id., at Exhibit 1)

33.     As consideration for the Loan Agreement, Mr. Bartold signed a Note (hereinafter "the Note"), which incorporates the Loan Agreement and Payment Plan by reference, and granted a security interest to Wells Fargo in an Adjustable Rate Open-End Mortgage (hereinafter "the Mortgage"). A copy of the Note and Mortgage are attached hereto as Exhibit B and Exhibit C.

34.     The Note and Mortgage both permit Wells Fargo to collect costs and expenses, including customary attorney's fees, associated with the enforcement of the Note or Mortgage.

35.     The Loan Agreement, Note, and Mortgage are hereinafter referred to as "the loan documents."

36.     **Mr.** Bartold's selection of the "modified tenure" plan for his $600 monthly payments is uniformly reflected in the other loan origination documents, including:

   a.   the "Final Loan Terms," signed by Mr. Bartold on October 26, 2009, in which

        "Modified Tenure" is checked in a field titled "Payment Plan Type," a monthly

        payment of $600 is indicated, and "N/A" is typed in a field titled "Requested

        Length of Payment Term—Duration in Month;"

   b.   the "Estimated Amortization Schedule for Vincent J. Bartold," signed and

        initialed by Mr. Bartold on October 26, 2009, which states the monthly payment

        is $600 and includes an amortization schedule showing payments to Mr. Bartold

        until he is 100;

   c.   the "Total Annual Loan Cost Rate," signed by Mr. Bartold on October 26, 2009,

        which shows a monthly loan advance of $600 and has "length of term" left blank;

        and

   d.   the "Residential Loan Application for Reverse Mortgages," which has "modified

        tenure" checked under "loan payment plans" and indicates the information was

        taken by telephone from Mr. Bartold by James A. McMinn, an employee of Wells

        Fargo Bank, N.A., 62 Kenosia Ave, Danbury, CT  06810.

37.     Nowhere in the loan locuments does Mr. Bartold elect to receive his monthly

payments on a "term" or "modified term" payment plan.

*Wells Fargo refuses to make monthly payments to Mr. Bartold in accordance with the loan*

*documents and induces him to accept lower monthly payments over a limited term.*

38.     Mr. Bartold began receiving monthly payments of $600 from Wells Fargo

beginning in November 2009.

39.     Approximately one year later, Mr. Bartold noticed that the monthly statements he

was receiving from Wells Fargo seemed to indicate that the payments were not being made

based on the "modified tenure" payments schedule contained in the loan documents.

40.    Each monthly loan statement, including the one covering November 2009, the first month after the loan was originated, listed Mr. Bartold's payment plan as "modified term" when it was in fact "modified tenure."

41.    Mr. Bartold contacted Wells Fargo by telephone several times thereafter to inquire about whether his monthly payments were being made on the "modified tenure" schedule he had elected in the loan documents.

42.    In these phone conversations, agents and/or employees of Wells Fargo repeatedly told Mr. Bartold that that the monthly payments on his reverse mortgage were being made on a "modified term" payment schedule, not a "modified tenure" schedule.

43.    Wells Fargo's agents and/or employees further told Mr. Bartold that this "modified term" payment schedule meant that Wells Fargo would only make monthly payments of $600 to him for a limited term of years, approximately 13 years from the closing of the loan; after this term passed, Wells Fargo would no longer make monthly payments to Mr. Bartold in any amount.

44.    At no point had Mr. Bartold requested that Wells Fargo change his payment schedule from "modified tenure" to "modified term."

45.    In these telephone calls, Mr. Bartold repeatedly told Wells Fargo agents and/or employees that Wells Fargo had made an error and that he and Wells Fargo had agreed to a "modified tenure" payment schedule in the loan documents in which Wells Fargo would pay him $600 a month for life, so long as he lived in the property.

46.    Mr. Bartold told Wells Fargo that he never would have agreed to a reverse mortgage if it had meant that he would only receive monthly payments for a limited number of

years.

47.     Agents and/or employees of Wells Fargo nevertheless insisted that the payment plan for Mr. Bartold's reverse mortgage was on a "modified term" schedule.

48.     Agents and/or employees of Wells Fargo told Mr. Bartold that he was not entitled to receive payments of $600 per month on a "modified tenure" schedule.

49.     Agents and/or employees of Wells Fargo persisted in their claim that Mr. Bartold's payment plan was "modified term" even though Wells Fargo itself originated the loan and the loan documents signed by Wells Fargo unequivocally indicate that the payment plan is "modified tenure."

50.     Agents and/or employees of Wells Fargo told Mr. Bartold that his only option to continue receiving any monthly payments beyond the approximately 13-year term was to reduce the amount he received each month below $600.  Even then, agents and/or employees of Wells Fargo told Mr. Bartold that he would only receive payments of $500 for 16 years and then would receive nothing.

51.     Mr. Bartold feared for his future and his continued ability to live independently in his home based on Wells Fargo's refusal to pay him $600 per month for life as provided in the loan documents.  Believing that he had no other options, and in reliance on Wells Fargo's representations that he would not receive any monthly payments beyond the approximately 13-year term, Mr. Bartold told Wells Fargo in May 2011 that it could reduce his payments to $500 per month, as Wells Fargo had proposed, so as to extend the number of years in which he would receive payments.

52.     In May 2011, Mr. Bartold signed a "Change of Payment Plan" form prepared by Wells Fargo that misleadingly and inaccurately stated that Mr. Bartold was electing to change his

9

payment plan from "modified term" to "modified term."

53.     Wells Fargo charged Mr. Bartold a "recalculation fee" when it reduced his monthly payments from $600 to $500, even though Wells Fargo had incorrectly recalculated Mr. Bartold's new payment amount based on the loan documents and HUD regulations.

54.     From June 2011 until the present, Wells Fargo has paid Mr. Bartold only $500 per month.

55.     Since 2011, Mr. Bartold has continued to contact Wells Fargo regularly to explain that he elected a "modified tenure" payment schedule in the loan documents and to request that Wells Fargo allow him to receive monthly payments of $600 per month according to a "modified tenure" schedule.

56.     Wells Fargo agents and/or employees have continued to tell Mr. Bartold that the loan documents were for a "modified term" plan, not a "modified tenure" plan.

57.     Wells Fargo agents and/or employees have refused to allow Mr. Bartold to receive monthly payments of $600 on a "modified tenure" schedule.

58.     Despite its continuing failure to correctly service the loan in accordance with the loan documents and to make accurate representations regarding the loan documents, Wells Fargo has nevertheless charged Mr. Bartold a servicing fee of $30 each month since the loan was originated.

59.     In response to Mr. Bartold's inquiries, in December 2013 Wells Fargo mailed him a copy of his loan documents, which clearly state that Mr. Bartold was to receive payments of $600 per month pursuant to a "modified tenure" schedule.

60.     Thereafter, Mr. Bartold called Wells Fargo and again informed its agent and/or employee that his loan documents indicated a "modified tenure" schedule. Wells Fargo's agent

again insisted that the payment schedule in the loan documents was for a "modified term," even though it had recently mailed him his loan documents stating otherwise.

61.    During this call, Wells Fargo's agent and/or employee told Mr. Bartold to read out loud specific excerpts of the loan documents that Wells Fargo had mailed him. Mr. Bartold did so and read to Wells Fargo's agent the portions of the loan document that clearly indicate his payment scheduled is for "modified tenure."

62.    Wells Fargo's agent and/or employee then stated that he was able to a view a copy of Mr. Bartold's loan documents in Wells Fargo's system. Wells Fargo's agent was silent for what seemed to Mr. Bartold to be an unusually long time. Wells Fargo's agent then admitted that the loan documents showed Mr. Bartold's payment schedule was for "modified tenure," not "modified term."

63.    Mr. Bartold requested that Wells Fargo make payments to him of $600 per month on the modified tenure schedule described in the loan documents. Wells Fargo's agent and/or employee stated he would get back to Mr. Bartold in approximately two weeks and terminated the call.

64.    Mr. Bartold did not receive a follow-up call from Wells Fargo regarding his request.

65.    Thereafter, Mr. Bartold again contacted Wells Fargo. Wells Fargo's agent and/or employee told Mr. Bartold that it did not matter that his loan documents indicated a "modified tenure" schedule. The agent further stated Wells Fargo would only pay him only $430 a month, not $600, if he changed his payment schedule to "modified tenure."

66.    The reduced payments of $500 that Wells Fargo has paid to Mr. Bartold from June 2011 to the present are inadequate to cover his basic living expenses.

67.     Mr. Bartold fears he will be unable to remain in his home if Wells Fargo does not immediately increase his monthly payment to $600.

68.     Mr. Bartold also continues to fear for his financial security and his continued ability to live in his home once Wells Fargo ceases making any monthly payments.

69.     Upon information and belief, Wells Fargo's calculation of the amount Mr. Bartold should receive under a "modified term" payment plan was incorrect under HUD regulations and the Loan Documents; a "modified term" plan for 16 years rather than a "modified tenure" plan for life should have increased Mr. Bartold's monthly payments, not reduced them by $100.

70.     Upon information and belief, under HUD regulations and the loan documents, a payment plan change to "modified tenure" from "modified term," as requested by Mr. Bartold since 2011, should result in Wells Fargo making payments of at least $600 per month to Mr. Bartold, not further reducing his payments.

71.     Upon information and belief, Wells Fargo stands to benefit from the reduced payments to Mr. Bartold on the "modified term" payment plan because this will result in an overall lower loan advance to Mr. Bartold but will still enable Wells Fargo to collect equally sized servicing and other fees from him.

72.     As a result of the defendant's actions described herein, Mr. Bartold has suffered serious and ongoing financial loss.

73.     As a result of the defendant's actions described herein, Mr. Bartold suffered and continues to suffer severe emotional distress, anxiety, and mental anguish.

74.     The defendant's actions described herein were willful, wanton, and/or reckless and indicate a reckless disregard for the just rights or safety of others and/or the consequences of its actions.

75.     Mr. Bartold and Wells Fargo are "persons" as defined by Conn. Gen. Stat. §42-110a(3).

76.     The actions of Wells Fargo, as described herein, were carried out in the conduct of trade or commerce.

77.     Wells Fargo's actions and omissions offend public policy, including that set forth in 12 U.S.C. § 1715z-20 and 24 C.F.R. § 206.

78.     Wells Fargo has engaged in a continuous course of unfair and/or deceptive acts or practices within the meaning of Conn. Gen. Stat. §42-110b(a) including in one or more of the following ways:

    a.  by misrepresenting to Mr. Bartold the terms of the loan and unjustifiably delaying closing, reducing the monthly payments Mr. Bartold would otherwise have received;

    b.  by failing to abide by the payment plan Mr. Bartold elected in the loan documents, a loan Wells Fargo itself originated;

    c.  by unilaterally changing Mr. Bartold's payment plan from "modified tenure" to "modified term," in violation of the loan documents and/or HUD regulations;

    d.  by misrepresenting to Mr. Bartold that his payment plan was "modified term" on his monthly loan statements and in telephone calls;

    e.  by misrepresenting to Mr. Bartold that his monthly payments of $600 would terminate after approximately 13 years;

    f.  by misrepresenting to Mr. Bartold that Wells Fargo could not pay him $600 per month according to a "modified tenure" payment plan;

    g.  by failing to appropriately and timely investigate whether Mr. Bartold's loan

13

documents provided for a "modified tenure" payment plan;

h.  by refusing to allow Mr. Bartold to receive his monthly payments of $600 on a "modified tenure" schedule upon his request;

i.  by making material misrepresentations or omissions likely to mislead a consumer acting reasonably under the circumstances, including misrepresenting to Mr. Bartold that his only option to continue to receive monthly payments beyond approximately 13 years was to accept a reduction in payments;

j.  by inducing Mr. Bartold to agree to lower monthly payments for a limited term based on its material misrepresentations and omissions;

k.  upon information and belief, by miscalculating the amount Mr. Bartold should have received under a "modified term" plan for 16 years so as to further reduce his monthly payments;

l.  by depriving Mr. Bartold of his $600 per month loan advance from June 2011 to the present;

m.  upon information and belief, by misrepresenting to Mr. Bartold that changing to a "modified tenure" plan will further reduce his payments and miscalculating the amount he should now receive under a "modified tenure" plan;

n.  by charging Mr. Bartold unjustified recalculation fees and other servicing fees; and/or

o.  by failing to follow HUD regulations pertaining to the origination and/or servicing of HECM reverse mortgage loans.

79.     Wells Fargo's actions are immoral, unscrupulous, unethical and oppressive and cause substantial injury to borrowers of reverse mortgage loans originated and serviced by Wells

Fargo, including the plaintiff.

80.    As a direct, proximate and foreseeable result of the foregoing acts and omissions, Mr. Bartold has suffered an ascertainable loss as that term is used in Conn Gen. Stat. §42-110g(a).

81.    A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection pursuant to Conn Gen. Stat. §42-110g(c).

## COUNT II:  BREACH OF CONTRACT

1-72.   ¶¶ 1-25 and  29-72 of Count I are incorporated by reference as if fully stated herein.

73.    Mr. Bartold and Wells Fargo entered into a valid contract in which Wells Fargo agreed to pay him $600 per month as a loan advance under a "modified tenure" payment schedule in accordance with the loan documents.

74.    Mr. Bartold fully performed under his contract with Wells Fargo.

75.    At not point was the loan "due and payable" under the loan documents.

76.    Wells Fargo breached its contract with Mr. Bartold, including by unilaterally changing his payments schedule from "modified tenure" to "modified term," failing to make the contractual payments as agreed to in the loan documents, and refusing to allow Mr. Bartold to receive his payments of $600 per month on a "modified tenure" payment schedule.

77.    As a direct and foreseeable result of Wells Fargo's breach of the loan documents, Mr. Bartold suffered damages, as more fully described herein.

## COUNT III:  NEGLIGENT MISREPRESENTATION

1-74.   ¶¶ 1-74 of Count I are incorporated by reference as if fully stated herein.

75.    At all relevant times, Wells Fargo knew or should have known that the loan

15

documents provided that Wells Fargo would make monthly payments to Mr. Bartold of $600 based on a "modified tenure" payment plan.

76.     At all relevant times, Wells Fargo knew or should have known that a payment plan for loan advances under a HECM reverse mortgage could only be changed in accordance with the loan documents and HUD regulations.

77.     Throughout the relevant period, Wells Fargo represented to Mr. Bartold that it could not make payments to him of $600 per month based on a "modified tenure" plan.

78.     Through the relevant period, Wells Fargo further represented to Mr. Bartold that the loan documents provided for monthly payments on a "modified term" payment plan, that it would not make any monthly payments to him following the expiration of this term, and that Mr. Bartold could only receive payments beyond this term if he agreed to a reduction in the monthly payment amount pursuant under a "modified term" payment plan.

79.     Mr. Bartold relied on Wells Fargo's representations in agreeing to reduce his monthly payments from $600 per month to $500 per month, effective June 2011.

80.     Wells Fargo negligently made misrepresentations of fact, including that Mr. Bartold's monthly payments of $600 were made pursuant to a "modified term" payment plan, that it knew or should have known was false.

81.     Mr. Bartold relied on Wells Fargo's representations when he agreed to reduce his monthly payments from $600 per month to $500 per month, resulting in monetary loss.

82.     Wells Fargo is liable for the damages alleged hereunder as a result of its negligent misrepresentations to Mr. Bartold.

## PRAYER FOR RELIEF

Wherefore, the plaintiff Vincent Bartold ("Mr. Bartold") requests that this Court:

1.      Order the defendant to refrain from further breaches of the Home Equity Conversion Loan Agreement and Note;

2.      Order the defendant to correct Mr. Bartold's mortgage account to reflect that it is a "modified tenure" plan with monthly payments of $600; disgorge itself of all unwarranted fees it charged to Mr. Bartold, including payment recalculation and servicing fees; and pay to Mr. Bartold the amounts it should have paid under the modified tenure plan from May 2011 until the date of judgment;

3.      Order defendant to pay to Mr. Bartold monetary damages, including actual and consequential damages pursuant to Connecticut Gen. Stat. §42-110g(a);

4.      Order defendant to pay to Mr. Bartold punitive damages in an amount calculated to punish the defendant for its willful and egregious conduct pursuant to Conn. Gen. Stat. §42-110g(a) and/or the common law;

5.      Award reasonable attorneys' fees and costs, pursuant to Conn. Gen. Stat. §42-110g(d) and/or Conn. Gen. Stat. §42-150bb;

6.      Enjoin all unlawful acts and practices complained of herein, pursuant to Connecticut Gen. Stat. §42-110g(d);

7.      Order such other and further relief as this Court deems just and proper.

Dated: May 12, 2014
Hartford, Connecticut

                              THE PLAINTIFF,
                              VINCENT BARTOLD

                              By: _____/434815/_____
                                  Sarah White
                                  Connecticut Fair Housing Center
                                  Attorneys for Vincent Bartold
                                  221 Main Street, 4th Floor
                                  Hartford, CT  06106
                                  Tel: (860) 263-0726
                                  Fax: (860) 247-4236
                                  Juris No. 430272

A TRUE COPY ATTEST.

Keith D Niziankiewicz
Connecticut State Marshal
Indifferent Person

18

| | | |
|---|---|---|
| **RETURN DATE: June 3, 2014** | : | **SUPERIOR COURT** |
| | : | |
| Vincent Bartold, | : | **JUDICIAL DISTRICT OF** |
| | : | **FAIRFIELD** |
| Plaintiff, | : | |
| | : | **AT BRIDGEPORT** |
| | : | |
| v. | : | |
| | : | |
| Wells Fargo Bank, N.A., | : | |
| | : | |
| Defendant. | : | **May 12, 2014** |

## STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is fifteen thousand dollars or more,

exclusive of interest and costs.

Dated: May 12, 2014
Hartford, Connecticut

THE PLAINTIFF,
VINCENT BARTOLD

By: _____/434815/_____
    Sarah White
    Connecticut Fair Housing Center
    Attorneys for Vincent Bartold
    221 Main Street, 4th Floor
    Hartford, CT 06106
    Tel: (860) 263-0726
    Fax: (860) 247-4236
    Juris No. 430272

A TRUE COPY ATTEST

Keith D Niziankiewicz
Connecticut State Marshal
Indifferent Person

# EXHIBIT A

THIS IS TO CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL DOCUMENT  *LJ*
WELLS FARGO BANK N.A.

## HOME EQUITY CONVERSION LOAN AGREEMENT

FHA Case No.

THIS AGREEMENT is made this 26TH day of OCTOBER, 2009                    , among
VINCENT J BARTOLD,,,

("Borrower"),

WELLS FARGO BANK, N.A,

("Lender") and the Secretary of Housing and Urban Development ("Secretary").

### Article 1 - Definitions

1.1   Expected Average Mortgage Interest Rate means the amount indicated on the attached payment plan (Exhibit 1). It is a constant interest rate used to calculate monthly payments to the Borrower throughout the life of the loan.

1.2   Loan Advances means all funds advanced from or charged to Borrower's account under conditions set forth in this Loan Agreement, whether or not actually paid to Borrower.

1.3   Loan Documents means the Note, Second Note, Security Instrument and Second Security Instrument.

1.4   Maximum Claim Amount means the lesser of the appraised value of the Property or the maximum dollar amount for an area established by the Secretary for a one-family residence under Section 203(b)(2) of the National Housing Act (as adjusted where applicable under Section 214 of the National Housing Act). Both the appraised value and the maximum dollar amount for the area shall be as of the date the conditional commitment is issued. Closing costs shall not be taken into account in determining appraised value.

1.5   Note means the promissory note signed by Borrower together with this Loan Agreement and given to Lender to evidence Borrower's promise to repay, with interest, Loan Advances by Lender or Lender's assignees.

1.6   Principal or Principal Balance means the sum of all Loan Advances made as of a particular date, including interest and mortgage insurance premiums.

1.7   Principal Limit means the amount indicated on the attached payment plan (Exhibit 1) when this Loan Agreement is executed, and increases each month for the life of the loan at a rate equal to one-twelfth of the mortgage interest rate in effect at that time, plus one-twelfth of one-half percent per annum. The Principal Limit is calculated using factors provided by the Secretary, which take into account the age of the youngest Borrower, the mortgage interest rate, and the Maximum Claim Amount.

1.8   Principal Residence means the dwelling where the Borrower maintains his or her permanent place of abode, and typically spends the majority of the calendar year. A person may have only one principal residence at any one time. The Property shall be considered to be the Principal Residence of any Borrower who is temporarily or permanently in a health care institution as long as the Property is the Principal Residence of at least one other Borrower who is not in a health care institution.

1.9   Property means Borrower's property identified in the Security Instrument.

1.10  Second Note means the promissory note signed by Borrower together with this Loan Agreement and given to the Secretary to evidence Borrower's promise to repay, with interest, Loan Advances by the Secretary secured by the Second Security Instrument.

1.11  Second Security Instrument means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Second Note.

1.12  Security Instrument means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Note.

### Article 2 - Loan Advances

2.1   General. Lender agrees to make Loan Advances under the conditions set forth in this Loan Agreement in consideration of the Note and Security Instrument given by Borrower on the same date as this Loan Agreement.

2.2   Initial Advances.

2.2.1   Loan Advances shall be used by Lender to pay, or reimburse Borrower for, closing costs listed in the Schedule of Closing Costs (Exhibit 2) attached to and made a part of this Loan Agreement, provided that Loan Advances will only be used to pay origination fees in an amount not exceeding the maximum permitted under Section 255(r) of the National Housing Act and as determined by the Secretary, nor shall the Lender charge the Borrower an origination fee in excess of this amount.

2.2.2   Loan Advances shall be used by Lender to discharge the liens on the Property listed in the Schedule of Liens (Exhibit 2) attached to and made a part of this Loan Agreement.

2.2.3   Lender shall pay an initial Loan Advance to Borrower in the amount indicated on the attached payment plan (Exhibit 1).

2.2.4   Initial Advances required by this Section 2.2, shall be made as soon as such advances are permitted by the applicable provisions of 12 CFR Part 226 (Truth in Lending) governing Borrower's right of rescission, but not before that time.

2.3   **Set Asides.**

2.3.1   Amounts set aside from the Principal Limit shall be considered Loan Advances to the extent actually disbursed or earned by Lender.

2.3.2   Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) for repairs to be made in accordance with a Repair Rider attached to and made a part of this Loan Agreement (Exhibit 3).

2.3.3   Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payments due for first year property charges consisting of taxes, hazard insurance, ground rents and assessments.

2.3.4   Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payment due for a fixed monthly charge for servicing activities of Lender or its servicer. Such servicing activities are necessary to protect Lender's interest in the Property. A servicing fee set aside, if any, is not available to the Borrower for any purpose, except to pay for loan servicing.

2.4   Charges and Fees. Borrower shall pay to Lender reasonable and customary charges and fees as permitted under 24 CFR 206.207(a). Such amounts shall be considered Loan Advances when actually disbursed by Lender.

2.5   **Monthly Payments.**

2.5.1   Loan Advances paid directly to the Borrower shall be made in equal monthly payments if requested by Borrower.

2.5.2   Monthly payments shall be calculated for either the term payment plan or the tenure payment plan, as requested by Borrower.

2.5.3   Monthly payments under the term payment plan are made only during a term chosen by Borrower and shall be calculated so that the sum of (i) or (ii) added to (iii), (iv), (v) and (vi) shall be equal to or less than the Principal Limit at the end of the term:

(i) Initial Advances under Section 2.2, plus any initial servicing fee set aside under Subsection 2.3.4; or
(ii) The Principal Balance at the time of a change in payments under Sections 2.8, and 2.9, plus any remaining servicing fee set aside under Subsection 2.3.4.; and
(iii) The portion of the Principal Limit set aside as a line of credit under Section 2.7., including any set asides for repairs (Subsection 2.3.2.) and first year property charges (Subsection 2.3.3.); and
(iv) All monthly payments due through the payment term, including funds withheld for payment of property charges under Section 2.10.; and
(v) All mortgage insurance premiums, or monthly charges due to the Secretary in lieu of mortgage insurance premiums, which are due through the payment term (Subsection 2.13.); and
(vi) All interest through the payment term. The Expected Average Mortgage Interest Rate shall be used for this purpose.

2.5.4   Monthly payments under the tenure payment plan shall be calculated as in Subsection 2.5.3. as if there were a payment term with the number of months in the term equal to the sum of 100 minus the age of the youngest Borrower multiplied by 12, but payments shall continue until the loan becomes due and payable as provided in the Loan Documents.

2.5.5   Monthly payments shall be paid to Borrower on the first business day of a month.

2.5.6   If Borrower has requested monthly payments, payments shall be indicated on the attached payment plan (Exhibit 1). The payment plan may be changed by Borrower as provided in Sections 2.8. and 2.9.

2.6   **Line of Credit without Monthly Payments.**

2.6.1   Borrower can request Loan Advances under a line of credit payment plan in amounts and at times determined by Borrower, if the Principal Balance of the loan after the Loan Advance is made, is less than or equal to the applicable Principal Limit, excluding any portion of the Principal Limit set aside under Sections 2.3.2. or 2.3.4. The line of credit amount increases at the same rate as the total Principal Limit increases under Section 1.7.

2.6.2 Line of credit payments shall be paid to Borrower within five business days after Lender has received a written request for payment by Borrower.

2.6.3 Lender may specify a form for line of credit payment requests.

2.6.4 Lender shall provide Borrower with a statement of the account every time a line of credit payment is made. The statement shall include the current interest rate, the previous Principal Balance, the amount of the current Loan Advance, the current Principal Balance after the Loan Advance, and the current Principal Limit.

## 2.7 Line of Credit with Monthly Payments.

2.7.1 Borrower may receive monthly payments under either a term or tenure payment plan combined with a line of credit, as indicated on the attached payment plan (Exhibit 1).

2.7.2 Subsections 2.6.2., 2.6.3. and 2.6.4. apply to a line of credit combined with term or tenure payments.

2.7.3 If Borrower combines a line of credit with a term or tenure payment plan, the Principal Limit is divided into: (a) an amount for the line of credit payments, including repair and property charge set asides; (b) an amount for monthly payments which shall be calculated under Subsections 2.5.3. or 2.5.4.; and (c) an amount for a servicing fee set aside, if required by Lender under Subsection 2.3.4. Amounts designated for line of credit payments and monthly payments increase independently at the same rate as the total Principal Limit increases under Section 1.7. Borrower can request Loan Advances in amounts and at times determined by Borrower, if the requested amount is less than or equal to the difference between (a) the Principal Limit applicable to the line of credit set aside and (b) the portion of the outstanding Principal Balance attributable to draws on the line of credit, including accrued interest and mortgage insurance premium or monthly charge due to the line of credit, but excluding any portion of the Principal Limit set aside under Subsections 2.3.2. and 2.3.4.

2.7.4 A Borrower receiving monthly payments in combination with a line of credit may prepay the outstanding mortgage balance in accordance with the terms of the Note.

## 2.8 Change in Payments Generally.

2.8.1 Whenever the Principal Balance of the loan is less than the Principal Limit, Borrower may change from any payment plan allowable under this Loan Agreement to another.

2.8.2 If Borrower requests that monthly payments be made after a change in payment plan, Lender shall recalculate future monthly payments in accordance with Subsections 2.5.3. or 2.5.4.

2.8.3 Lender may charge a fee not to exceed an amount determined by the Secretary, whenever payments are recalculated and in any other circumstances in which Borrower is required to sign a form acknowledging a change in payment plan as provided in Subsection 2.8.5.

2.8.4 Loan Advances under a new payment plan shall be paid to Borrower in the same manner and within the time period required under Sections 2.5., 2.6. or 2.7.

2.8.5 Changes in the payment plan must be acknowledged by Borrower by signing a form containing the same information as the attached payment plan (Exhibit 1). Lender shall provide a copy of the completed form to Borrower.

## 2.9 Change in Payments Due to Initial Repairs.

2.9.1 If initial repairs after closing, made in accordance with the Repair Rider, are completed without using all of the repair set aside, Lender shall inform Borrower of the completion and the amount then available to the Borrower to be drawn under a line of credit.

2.9.2 If initial repairs after closing, made in accordance with the Repair Rider, cannot be fully funded from the repair set aside, any additional Loan Advances needed to complete repairs shall be made in the manner provided under Section 2.16.

2.9.3 If initial repairs are not completed when required by the Repair Rider, Borrower shall not request and Lender shall not make any further payments, except as needed to pay for repairs required by the Repair Rider and mandatory Loan Advances under Section 4.5. In order to complete the required repairs, Loan Advances shall be made first from the repair set aside, and then in the manner provided under Section 2.16.

## 2.10 Payment of Property Charges.

2.10.1 Borrower has elected to require Lender to use Loan Advances to pay property charges consisting of taxes, hazard insurance premiums, ground rents and special assessments if indicated on the attached payment plan (Exhibit 1). Borrower may change this election by notifying Lender and at that time Lender shall pay to Borrower any amounts withheld from the Loan Advances to pay property charges.

2.10.2 If Borrower has made the election under Subsection 2.10.1. and Borrower is receiving monthly payments, Lender shall withhold amounts from each monthly payment and use the amounts withheld to make timely payments of

property charges. The amounts withheld shall be calculated as provided in Subsection 2.10.3. Amounts withheld from monthly payments shall not be treated as Loan Advances and shall not bear interest except to the extent actually disbursed by Lender.

2.10.3  Lender shall withhold from each monthly payment an amount to pay (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for fire, flood and other hazard insurance required by the Security Instrument. Each monthly withholding for items (a), (b) and (c) shall equal one-twelfth of the annual amounts, as reasonably estimated by Lender. The full annual amount for each item shall be paid by Lender before an item would become delinquent. Lender shall add the amounts for items (a), (b) and (c) to the Principal Balance when paid. If at any time the withholding for items (a), (b) or (c) exceeds the amount of actual property charges, Lender shall pay the excess withholding to Borrower and add it to the Principal Balance. If the total of the withholding for items (a), (b), or (c) is insufficient to pay the item when due, the amount necessary to make up the deficiency on or before the date the item becomes due shall be paid as a Loan Advance in the manner provided under Section 2.16.

2.10.4  If Borrower has made the election under Subsection 2.10.1 and Borrower is not receiving monthly payments, Lender shall make Loan Advances under the line of credit payment plan as needed to make timely payments of property charges, provided that no such Loan Advance shall exceed the amount permitted by Section 2.6.1.

2.10.5  If Borrower fails to pay the property charges in a timely manner, and has not elected to have Lender make the payments, Lender shall pay the property charges as a Loan Advance as required under Section 2.16. If a pattern of missed payments occurs, Lender may establish procedures to pay the property charges from Borrower's funds as if Borrower elected to have Lender pay the property charges.

2.10.6  Lender shall immediately notify any Borrower who has made the election under Subsection 2.10.1.whenever Lender determines that amounts available from monthly payments or line of credit payments will be insufficient to pay property charges.

2.11  Insurance and Condemnation Proceeds. If insurance or condemnation proceeds are paid to Lender, the Principal Balance shall be reduced by the amount of the proceeds not applied to restoration or repair of the damaged Property and the available loan funds shall be recalculated. At the same time, the Principal Limit also shall be reduced by the amount of the proceeds applied to reduce the Principal Balance.

2.12  Interest.
2.12.1  Interest shall be calculated as provided in the Loan Documents.

2.12.2  Interest shall accrue daily and be added to the Principal Balance as a Loan Advance at the end of each month.

2.13  Mortgage Insurance Premium (MIP); Monthly Charge.
2.13.1  Monthly MIP shall be calculated as provided in 24 CFR Part 206. If the Security Instrument is held by the Secretary or if the Secretary makes Loan Advances secured by the Second Security Instrument, a monthly charge shall be due to the Secretary and shall be calculated in the same manner as MIP.

2.13.2  The full amount of monthly MIP or monthly charge, including any portion of the MIP retained by a Lender under 24 C.F.R.206.109, shall be considered to be a Loan Advance to Borrower on the later of the first day of the month or the day Lender pays the MIP to the Secretary. If any MIP is due to the Secretary. In the event that the Note becomes due and payable or the Note is prepaid in full after the first day of the month, Lender may add the accrued MIP to the Principal Balance or the Secretary may add the accrued monthly charge to the Principal Balance.

2.14  Manner of Payment. For purposes of this Section "Borrower" shall not include any person who signed this Loan Agreement but who has a Principal Residence different from the Property. Only a Borrower has a right to receive Loan Advances. Borrowers shall choose to receive Loan Advances by either electronic funds transfer to a bank account designated by all Borrowers or by check mailed to an address designated by all Borrowers, except where direct payment or that payment should be made directly to a third party for the benefit of the Borrowers. Borrowers may change the manner of payment by notifying Lender, 95XA : 06/06 Page 4 property charges. The amounts withheld shall be calculated as provided in Subsection 2.10.3. Amounts withheld from monthly payments shall not be treated as Loan Advances and shall not bear interest except to the extent actually disbursed by Lender.

2.15  Protection of Property.
2.15.1  If Borrower vacates or abandons the Property, or if Borrower is in default under the Security Instrument, then Lender may make reasonable expenditures to protect and preserve the Property and these expenditures will be considered Loan Advances as required under Section 2.16.

2.15.2  If Borrower fails to pay governmental or municipal charges, fines or impositions that are not included in Section 2.10. or if there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property. These expenditures will be considered Loan Advances as required under Section 2.16.

2.16  Unscheduled Payments. Loan Advances made pursuant to Sections 2.4., 2.9.2., 2.9.3., 2.10.3., 2.10.5., and 2.15. shall be made from a line of credit under Sections 2.6. or 2.7. to the extent possible. If no line of credit sufficient to make the Loan

Advances exists, any future monthly payments must be recalculated in accordance with Subsections 2.5.3. or 2.5.4. to create a line of credit sufficient to make the Loan Advances.

## Article 3 - Late Charge

3.1 Amount Due. Lender shall pay a late charge to Borrower for any late payment. If Lender does not mail or electronically transfer a scheduled monthly payment to Borrower on the first business day of the month or mail or electronically transfer a line of credit payment to Borrower within 5 business days of the date Lender received the request, the late charge shall be 10 percent of the amount that should have been paid to the Borrower for that month or as a result of that request. For each additional day that Lender fails to make payment, Lender shall pay interest on the late payment at the interest rate stated in the Loan Documents. If the Loan Documents provide for an adjustable interest rate, the rate in effect when the late charge first accrues shall be used. In no event shall the total late charge and interest exceed five hundred dollars. Any late charge shall be paid from Lender's funds and shall not be added to the unpaid Principal Balance.

3.2 Waiver. The Secretary may waive a late charge where the Secretary determines that the late payment resulted from circumstances beyond Lender's control and that no act or omission of Lender contributed to the late payment. At the time Lender requests a waiver, Lender shall inform Borrower that a waiver of late charge has been requested from the Secretary and that the late charge will be sent to Borrower if the waiver is denied. If the Secretary denies the waiver, Lender shall pay to Borrower the late charge and interest that accrued from the date the payment was late until the date the waiver was requested.

## Article 4 - Termination of Lender's Obligation to Make Loan Advances

4.1 Loan Due and Payable. Lender shall have no obligation to make Loan Advances if Lender has notified Borrower that immediate payment in full to Lender is required under one or more of the Loan Documents unless and until the notice is rescinded by Lender.

4.2 Loan Advances by Secretary. If the Security Instrument has been assigned to the Secretary or the Secretary notifies Lender and Borrower that Loan Advances are secured by the Second Security Instrument, Lender shall have no further obligation to make Loan Advances under this Loan Agreement, unless the Secretary accepts later reimbursement by the Lender for all Loan Advances made, earned or disbursed by the Secretary. The Secretary may establish procedures for handling requests for payments and changes in payment plans during the interval between Lender's notification of intent to assign the Security Instrument to the Secretary and completion of the assignment. Borrower shall be informed of such procedures by Lender and/or the Secretary, and Borrower shall comply with such procedures.

4.3 Lien Status Jeopardized. Lender shall have no obligation to make further Loan Advances if the Lender or the Secretary determines that the lien status of the Security Instrument or the Second Security Instrument is jeopardized under State laws as described in Paragraph 12(a) of the Security Instrument or Second Security Instrument and the lien status is not extended in accordance with Paragraph 12(a).

4.4 Bankruptcy. Lender shall have no obligation to make further Loan Advances on or following the date that a petition for bankruptcy of Borrower is filed.

4.5 Mandatory Loan Advances. Notwithstanding anything in Sections 4.1. through 4.4., all Loan Advances under Sections 2.10. (property charges), 2.12. (interest), 2.13. (MIP or monthly charge), 2.15. (protection of Property) or 2.3.4. (servicing fee) shall be considered mandatory Loan Advances by Lender.

4.6 Prepayment in Full. Lender shall not make Loan Advances if Borrower has paid the Note in full (or the Second Note, if the Secretary has assumed the Lender's rights and obligations under Article 5).

## Article 5 - HUD Obligation

If the Lender has no further obligation to make payments to Borrower because of Section 4.2., the Secretary shall assume the rights and obligations of Lender under this Loan Agreement, except the Secretary shall not assume any obligation of paying flood, fire and other hazard insurance from Loan Advances. If the Secretary makes Loan Advances to Borrower under the Second Security Instrument, the portion of the Principal Limit available for Loan Advances shall be the difference between the current Principal Limit and the combined Principal Balances on the Security Instrument less accrued interest and the Second Security Instrument.

## Article 6 - Miscellaneous

6.1 Forbearance Not a Waiver. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

6.2 Successors and Assigns Bounds; Joint and Several Liability; Co-Signers. The covenants and agreements of this Loan Agreement shall bind and benefit the successors and assigns of Lender. An assignment made in accordance with the regulations of the Secretary shall fully relieve the Lender of its obligations under this Loan Agreement. Borrower may not assign any rights or obligations under this Loan Agreement. Borrower's covenants and agreements shall be joint and several.

6.3 Notices. Any notice to Borrower provided for in this Loan Agreement shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the property address shown in the Security Instrument or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice to the Secretary shall

be given by first class mail to the HUD Field Office with jurisdiction over the Property or any other place designated by the Secretary. Any notice provided for in this Loan Agreement shall be deemed to have been given to Borrower, Lender or the Secretary when given as provided in this Section.

6.4   Governing Law; Severability. This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Loan Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Loan Agreement which can be given effect without the conflicting provision. To this end the provisions of this Loan Agreement are declared to be severable.

6.5   Copies. Lender, Borrower and the Secretary shall each receive one original executed copy of this Loan Agreement when signed by the Secretary.

6.6   When Agreement Becomes Binding. This Loan Agreement shall bind Lender and Borrower when both Lender and Borrower have signed. This Loan Agreement shall bind the Secretary only when the lender signs on behalf of the Secretary of Housing and Urban Development and a Mortgage Insurance Certificate is issued for the Security Instrument.

BY SIGNING BELOW the parties accept and agree to the terms contained in this Loan Agreement and the exhibits.


_Vincent J. Bartold_ _____   (Seal)
                                                                -Borrower
VINCENT J BARTOLD


_____   (Seal)
                                                                -Borrower


_____   (Seal)
                                                                -Borrower


_____   (Seal)
                                                                -Borrower


_____   (Seal)
                                                                -Borrower


_____   (Seal)
                                                                -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

WELLS FARGO BANK, N.A.

_____
                                        (Name of Lender)

SHAUN DONOVAN _____ (Seal)
Secretary of Housing and Urban Development
By: WELLS FARGO BANK, N.A.

*Pursuant to 24 CFR 206.15*

By: _/Lane Lewis-closer_____ (Seal)

By: _____ (Seal)

## HOME EQUITY CONVERSION MORTGAGE PAYMENT PLAN

Date of Payment Plan:                10/26/09
FHA Case Number: ▮▮▮▮▮▮▮▮
Name of Lender:   WELLS FARGO BANK, N.A.

**THIS IS TO CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT WELLS FARGO BANK N.A.**                *LJ*

Name of Borrower(s)
VINCENT J BARTOLD

Birthdate ▮▮▮▮▮▮▮

Expected Average Mortgage Interest Rate                     6.050 %

| | | |
|---|---|---|
| 1. Principal Limit | | $ 108325.00 |
| Initial Payments (if Completed at closing) | | |
| 2.   Closing Costs | $ 9190.00 | |
| 3.   Discharge of Liens | $ .00 | |
| 4. Outstanding Balance | $ | |
| (if completed after closing) | | |
| 5. Loan Advance | $ 10000.00 | |
| 6. Servicing Fee Set Aside | $ 4842.87 | |
| 7. Total Deductions from Principal Limit | | |
| (Lines 2 +3 +4 +5 +6) | $ 24032.87 | |

| | | |
|---|---|---|
| 8. Principal Limit for Line of Credit | $ .00 | |
| Funds in Line of Credit Designated for: | | |
| 9.   Repairs | $ .00 | |
| 10.   First Year Property Charges | $ .00 | |
| 11. Outstanding Balance on Line of Credit | $ | |
| from previous payments | | |
| 12. Total Deductions from Principal Limit for | | |
| Line of Credit (Lines 9 +10 +11) | $ .00 | |
| 13. Funds Available to Borrower in Line of | | |
| Credit (Lines 8 - 12) | | $ .00 |

| | | |
|---|---|---|
| 14. Net Principal Limit (Lines 1 - 7 - 9 - 10) | | $ 84292.13 |
| 15. Net Principal Limit Available for Monthly Payments | | $ 84292.13 |
| (Lines 14 - 13) | | |

Scheduled Payments:
16.   Term   (Remaining)   ☐ _____Yrs. _____Mos.
          or
17.   Tenure   ☒ (Check only one: Term or Tenure)
18.   Monthly Payment (Total)            $ 600.00
19.   Monthly Withholding (T & I)        $ .00
20.   Net Monthly Payment (Lines 18 - 19) $ 600.00

(For graduated monthly payments from a line of credit, see attached schedule.)

By signing below, the borrower(s) agree(s) that this document accurately
describes the principle features of the current payment plan chosen by the
borrower(s).

_Vincent J Bartold_                          10/26/09
Signature VINCENT J BARTOLD                  Date

_____          _____
Signature                                    Date

_____          _____
Signature                                    Date

_____          _____
Signature                                    Date

NMFL #8897 (PPMU) Rev 6/29/2005
90XA: 09/01

Exhibit 2

## Schedule of Closing Costs

See HUD-1 Settlement Statement for Schedule of Closing Costs.

## Schedule of Liens

| Item | Amount |
|------|--------|
| _____ | $ _____ . 00 |
| _____ | $ _____ . 00 |
| _____ | $ _____ . 00 |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

*V.B.*

NMFL #8833 (SFCC)  Rev 6/28/2005

80XA : 01/04

# EXHIBIT B

THIS IS TO CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL DOCUMENT
WELLS FARGO BANK N.A.          *L J*

# ADJUSTABLE RATE NOTE
## (HOME EQUITY CONVERSION)
FHA Case No. ██████████

OCTOBER 26, 2009

260 ROCKWELL AVE

STRATFORD, CT  06615

[Property Address]

**1. DEFINITIONS**
"Borrower" means each person signing at the end of this Note. "Lender" means
WELLS FARGO BANK, N.A.
and its successors and assigns. "Secretary" means the Secretary of Housing and
Urban Development or his or her authorized representatives.

**2. BORROWER'S PROMISE TO PAY; INTEREST**
In return for amounts to be advanced by Lender to or for the benefit of Borrower under the
terms of a Home Equity Conversion Loan Agreement dated          10/26/09 ("Loan
Agreement"), Borrower promises to pay to the order of Lender a principal amount equal to the sum
of all Loan Advances made under the Loan Agreement with interest. All amounts advanced by
Lender, plus interest, if not due earlier, are due and payable on JANUARY 28TH          ,2092
interest will be charged on unpaid principal at the rate of TWO AND 745/1000
percent (          2.745 %) per year until the full amount of
principal has been paid. The interest rate may change in accordance with Paragraph 5 of this Note.
Accrued interest shall be added to the principal balance as a Loan Advance at the end of each
month.

**3. PROMISE TO PAY SECURED**
Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument
that is dated the same date as this Note and called the "Security Instrument." That Security
Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

**4. MANNER OF PAYMENT**
(A) Time
Borrower shall pay all outstanding principal and accrued interest to Lender upon receipt of a
notice by Lender requiring immediate payment in full, as provided in Paragraph 7 of this Note.
(B) Place
Payment shall be made at WELLS FARGO BANK, N.A.
3480 STATEVIEW BLVD.  MAC X7802-038
FORT MILL, SC 29715-7203          800-472-3209          , or any such other
place as Lender may designate in writing by notice to Borrower.
(C) Limitation of Liability
Borrower shall have no personal liability for payment of the debt. Lender shall enforce the
debt only through sale of the Property covered by the Security Instrument ("Property"). If this
Note is assigned to the Secretary, the Borrower shall not be liable for any difference between
the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including
accrued interest, owed by Borrower at the time of the assignment.

**5. INTEREST RATE CHANGES**
(A) Change Date
The interest rate may change on the first day of  JANUARY  2010          , and on
☐ that day of each succeeding year  ☒ the first day of each succeeding month. "Change
Date" means each date on which the interest rate could change.

(B) The Index
Beginning with the first Change Date, the interest rate will be based on an Index.
"Index" means the average of interbank offered rates for one-month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*, rounded
to three digits to the right of the decimal point. The "Current Index" means the most recent
Index figure available 30 days before the Change Date, and if the day that is 30 days before
the Change Date is not a Sunday or Monday and not the first business day of the week, the
Current Index will be the Index as published the first business day of that week. If the day
that is 30 days before the Change Date is a Sunday or Monday and not the first business
day of the week, the Current Index will be the Index as published the first business day of
the immediately prior week. If the Index (as defined above) is no longer available, Lender will
use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice
of the new Index.

(C) Calculation of Interest Rate Changes
Before each Change Date, Lender will calculate a new interest rate by adding a margin of
TWO AND ONE-HALF          percentage points
(          2.500 %) to the Current Index. Subject to the limits stated in
Paragraph 5(D) of this Note, this amount will be the new interest rate until the next Change
Date.

(D) Limits on Interest Rate Changes
☐ The interest rate will never increase or decrease by more than two percentage points
(2.0%) on any single Change Date. The interest rate will never be more than five percentage
points (5.0%) higher or lower than the initial interest rate stated in Paragraph 2 of this Note.
☒ The interest rate will never increase above
TWELVE AND 745/1000          percent (          12.745 %)

**(E) Notice of Changes**
Lender will give notice to Borrower of any change in the interest rate. The notice must be given at least 25 days before the new interest rate takes effect, and must set forth (i) the date of the notice, (ii) the Change Date, (iii) the old interest rate, (iv) the new interest rate, (v) the Current Index and the date it was published, (vi) the method of calculating the adjusted interest rate, and (vii) any other information which may be required by law from time to time.

**(F) Effective Date of Changes**
A new interest rate calculated in accordance with paragraphs 5(C) and 5(D) of this Note will become effective on the Change Date, unless the Change Date occurs less than 25 days after Lender has given the required notice. If the interest rate calculated in accordance with Paragraphs 5(C) and 5(D) of this Note decreased, but Lender failed to give timely notice of the decrease and applied a higher rate than the rate which should have been stated in a timely notice, then Lender shall recalculate the principal balance owed under this Note so it does not reflect any excessive interest.

**6. BORROWER'S RIGHT TO PREPAY**
A Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty. Any amount of debt prepaid will first be applied to reduce the principal balance of the Second Note described in Paragraph 11 of this Note and then to reduce the principal balance of this Note.
All prepayments of the principal balance shall be applied by Lender as follows:
First, to that portion of the principal balance representing aggregate payments for mortgage insurance premiums;
Second, to that portion of the principal balance representing aggregate payments for servicing fees;
Third, to that portion of the principal balance representing accrued interest due under the Note; and
Fourth, to the remaining portion of the principal balance. A Borrower may specify whether a prepayment is to be credited to that portion of the principal balance representing monthly payments or the line of credit. If Borrower does not designate which portion of the principal balance is to be prepaid, Lender shall apply any partial prepayments to an existing line of credit or create a new line of credit.

**7. IMMEDIATE PAYMENT IN FULL**
**(A) Death or Sale**
Lender may require immediate payment in full of all outstanding principal and accrued interest if:
(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower, or
(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).
**(B) Other Grounds**
Lender may require immediate payment in full of all outstanding principal and accrued interest, upon approval by an authorized representative of the Secretary, if:
(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower;
(ii) For a period of longer than 12 consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or
(iii) An obligation of the Borrower under the Security Instrument is not performed.
**(C) Payment of Costs and Expenses**
If Lender has required immediate payment in full, as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorney's fees, associated with enforcement of this Note to the extent not prohibited by Applicable Law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.
**(D) Trusts**
Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph.

**8. WAIVERS**
Borrower waives the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**9. GIVING OF NOTICES**
Unless Applicable Law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the Property Address above or at a different address if Borrower has given Lender a notice of Borrower's different address.
Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note only through sale of the Property.

## 11. RELATIONSHIP TO SECOND NOTE

### (A) Second Note

Because Borrower will be required to repay amounts which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to grant a Second Note to the Secretary.

### (B) Relationship of Secretary Payments to this Note

Payments made by the Secretary shall not be included in the debt due under this Note unless:

(i) This Note is assigned to the Secretary; or

(ii) The Secretary accepts reimbursements by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, shall be included in the debt.

### (C) Effect on Borrower

Where there is no assignment or reimbursement as described in (B)(i) or (ii), and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under this Note until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note held by Secretary, notwithstanding anything to the contrary in Paragraph 7 of this Note; or

(ii) Be obligated to pay interest under this Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance of this Note, notwithstanding anything to the contrary in Paragraph 2 or 5 of this Note or any Allonge to this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_Vincent J. Bartold_ _____ (Seal)
VINCENT J BARTOLD                                              -Borrower

_____ (Seal)
                                                              -Borrower

_____ (Seal)
                                                              -Borrower

_____ (Seal)
                                                              -Borrower

# EXHIBIT C

007807 ⁣ VL3330PG34.l

RECEIVED FOR RECORD
SUSAN M. PAWLUK

2009 OCT 30  AM 10: 40

STRATFORD LAND RECORDS
ATTEST TOWN CLERK

When Recorded Mail To:
WFHM FINAL DOCS X2599-024
405 SW 5TH STREET
DES MOINES, IA 50309-4600

_____[Space Above This Line For Recording Data]_____

**State of Connecticut**                                     FHA Case No. 

# ADJUSTABLE RATE OPEN-END MORTGAGE
## HOME EQUITY CONVERSION MORTGAGE

THIS MORTGAGE ("Security Instrument") is a reverse mortgage as defined by section 36a-265(a) (4) of the Connecticut General Statutes Annotated and is given on          10/26/09 . The mortgagor is VINCENT J BARTOLD, A SINGLE PERSON

whose address is 260 ROCKWELL AVE
STRATFORD, CT 06615                                          ("Borrower")
This Security Instrument is given to WELLS FARGO BANK, N.A.

, which is
organized and existing under the laws of THE UNITED STATES          , and whose address is
P.O. BOX 11701
NEWARK, NJ 071014701                                   ("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). If Borrower has chosen to receive mortgage proceeds under a Tenure, Term, Modified Tenure, or Modified Term payment plan, the Lender agrees to pay consecutive monthly installments of principal in the amount of
SIX HUNDRED AND 00/100
Dollars ($          600.00 ) to Borrower on the 2ND          day of each month beginning
NOVEMBER          ,2009 . If Borrower has elected a Line of Credit payment plan, installments will be paid to Borrower when requested in accordance with the Loan Agreement. If Borrower has elected a Modified Tenure payment plan or a

First American Loan Production Services
© 2008 First American Real Estate Solutions LLC
FALPS# 79VF Rev 04/08 NMFL #0913CT Doc Id: QKCT Rev. 11/17/2008          Page 1

Connecticut HECM ARM Security Instrument

VL3330PG342

Modified Term payment plan, in addition to the scheduled monthly payments disclosed above, installments will be paid to Borrower when requested under the line of credit in accordance with the Loan Agreement. The amount of the monthly installments and the availability of the line of credit are subject to change if the Borrower chooses to change the type of payment plan originally selected. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest at a rate subject to adjustment (interest), and all renewals, extensions and modifications of the Note, up to a maximum principal amount of

TWO HUNDRED SIXTY TWO THOUSAND FIVE HUNDRED AND 00/100

(U.S. $            262,500.00            ); (b) the payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including amounts described in (a), (b), and (c) above, if not due earlier, is due and payable on JANUARY 28TH 2092 . For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in FAIRFIELD                    County, Connecticut:

SEE ATTACHED

which has the address of  . 260 ROCKWELL AVE

[Street]

STRATFORD                    .CT            06615            ("Property Address");
          [City]            [State]        [Zip Code]

[The following  paragraph is applicable only if, prior to loan closing, repairs are deemed necessary in order for the Property to meet the United States Department of Housing and Urban Development's Minimum Property Standards.

Buildings or improvements on the Property are in the process of construction or repair, or to be erected or repaired and Lender has agreed to make the loan herein described to be paid over to Borrower in installments as the work progresses, the time and amount of each advancement to be at the sole discretion and upon the estimate of Lender, so that when all of the work on the Property shall have been completed to the satisfaction of Lender. Lender shall then pay over to Borrower (from time to time as necessary under the terms of the Loan Agreement) any balance necessary to complete the full loan up to a maximum amount of $   175,000.00 . Borrower agrees to complete the erection or repair of said buildings to the satisfaction of Lender within a reasonable time from the date hereof or at the latest on or before ,

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

VL3330PG343

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

**2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

**3. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender instead of to Borrower and to Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**4. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument, and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**5. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect

VL3330PG344

Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

(a) **Due and Payable.** Lender may require immediate payment in full of all sums secured by this Security Instrument if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).

(b) **Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval of the Secretary, if:

(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(ii) For a period of longer than twelve (12) consecutive months, a Borrower fails to occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii) An obligation of the Borrower under this Security Instrument is not performed.

(c) **Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in this Paragraph (a) (ii) or (b) occur.

(d) **Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9 (a) (ii) or (b). Lender shall not have the right to commence foreclosure until Borrower has had thirty (30) days after notice to either:

VL3330PG345

(i) Correct the matter which resulted in the Security Instrument coming due and payable; or
(ii) Pay the balance in full; or
(iii) Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or
(iv) Provide the Lender with a deed in lieu of foreclosure.

**(e) Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

**(f) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within SIXTY DAYS                 from the date hereof, if permitted by Applicable Law Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to SIXTY DAYS      from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. Lien Status.**

**(a) Modification.** Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

**(b) Tax Deferral Programs.** Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

VL3330PG346

(c) **Prior Liens.** Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

13. **Relationship to Second Security Instrument.**

(a) Second Security Instrument. In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) Relationship of First and Second Security Instruments. Payments made by the Secretary shall not be included in the debt under the Note unless:
(i) This Security Instrument is assigned to the Secretary; or
(ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) Effect on Borrower. Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or
(ii) Be obligated to pay interest under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

(d) **No Duty of the Secretary.** The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

14. **Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

15. **Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

16. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless Applicable Law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

17. **Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

VL3330PG347

**18. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and this Security Instrument. NON-UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**19. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**20. Foreclosure Procedure. If** Lender requires immediate payment in full under Paragraph 9, Lender at its option may require payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**21. Lien Priority.** The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22. Adjustable Rate Feature.** Under the Note, the initial interest rate of    2.745          % which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to the change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the average of interbank offered rates for one-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal, rounded to three digits to the right of the decimal point, ("Index") plus a margin. If the Index is no longer available, Lender will use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice of the new Index.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on the first day of  JANUARY, 2010      , and on ☐ that day of each succeeding year ☒ the first day of each succeeding month ("Change Date") until the loan is repaid in full.

The "Current Index" means the most recent Index figure available 30 days before the Change Date, and if the day that is 30 days before the Change Date is not a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of that week. If the day that is 30 days before the Change Date is a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of the immediately prior week. Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

☐ (Annually Adjusting Variable Rate Feature) The Calculated Interest Rate cannot be more than 2.0% higher or lower than the Existing Interest Rate, nor can it be more than 5.0% higher or lower than the Initial Interest Rate.

VL3330PG348

[X]  (Monthly Adjusting Variable Rate Feature) The Calculated Interest Rate will never increase above TWELVE AND 745/1000                                          percent ( 12.745   %).

The Calculated Interest Rate will be adjusted if necessary to comply with these rate limitation(s) and will be in effect until the next Change Date. At any Change Date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Obligatory Loan Advances.** Lender's responsibility to make Loan Advances under the terms of the Loan Agreement, including Loan Advances of principal to Borrower, as well as Loan Advances for interest, MIP, Servicing Fees and other charges, is obligatory.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es).]

[ ]  Condominium Rider        [ ]  Planned Unit Development Rider

[ ]  Other (Specify)

(Acknowledgments on following page)

VL3330PG349

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_Vincent J. Bartold_____ (Seal)
VINCENT J BARTOLD                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

_____ (Seal)
                                                                    -Borrower

Witnesses:

_Koreen R. LaBrecque_____          _Joanne N. Webb_____
Koreen R. LaBrecque                     Joanne N. Webb

First American Loan Production Services
© 2008 First American Real Estate Solutions LLC
FALPS# 84YF: 04/08  NMFL #8913CT  Doc Id: QKCT                Page 9                Connecticut HECM ARM Security Instrument

VL3330PG350

---

[Space Below This Line For Acknowledgment]

**State of Connecticut**          ss.  STRATFORD

**County of** FAIRFIELD

On this the ___26th___ day of October_____ , 20 _09___ , before me, Koreen R. LaBrecque

undersigned officer, personally appeared      VINCENT J. BARTOLD

known to me (or satifactorily proven) to be the person whose name  ___he_____
subscribed to the within instrument and acknowledged that _____
he _____ executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

Koreen R. LaBrecque
Commissioner of the Superior Court

Title of Officer

---

VL 3330 PG 351

SCHEDULE "A"

All that certain piece or parcel of land, with the buildings thereon, situated in the Town of Stratford, County of Fairfield and State of Connecticut, known as 260 Rockwell Avenue and designated as Lot No. 129 on Map No. 4 of land in Stratford belonging to William J. Nichols and Adolph Sherman, made by Scofield and Ford, Surveyors, dated April 26, 1915, and on file in the Stratford Town Clerk's Office. Said premises are more particularly bounded and described as follows:

| | |
|---|---|
| NORTHERLY | by land of Mary Sottile, Lot No. 128 on said map, Two Hundred Ten and no/100ths (210.00) feet, more or less; |
| EASTERLY | by Rockwell Avenue, as shown on said map, Fifty and no/100ths (50.00) feet; |
| SOUTHERLY | by land of Michael J. Carroll and Marjorie A. Carroll, Lot No. 130 on said map, Two Hundred Ten and no/100ths (210.00) feet, more or less; and |
| WESTERLY | by land of Peter P. Sulzicki and Julie Sulzicki, Fifty and no/100ths (50.00) feet, more or less. |

Received for record OCT 3 0 2009
At *10:40am* and recorded by me

*Susan M. Pawluk*

Susan M. Pawluk, Town Clerk
Stratford