## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VINCENT BARTOLD,<br>        Plaintiff,<br><br>        v.<br><br>WELLS FARGO BANK, N.A.,<br>        Defendant. | No. 14-cv-00865 (VAB) |

## <u>RULING ON MOTION TO DISMISS</u>

Plaintiff, Vincent Bartold, brings this action against Defendant, Wells Fargo Bank, N.A.,

("Wells Fargo") alleging violations of the Connecticut Unfair Trade Practices Act ("CUTPA"),

Conn. Gen. Stat. § 42-110a *et seq.* (Count I), breach of contract (Count II), and negligent

misrepresentation (Count III).  Defendant has moved to dismiss the entire complaint.  For the

following reasons, Defendant's motion to dismiss [Doc. No. 14] is **DENIED**.

## BACKGROUND

All factual allegations in the complaint [Doc. No. 1-2] are assumed to be true for

purposes of evaluating a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007).  According to the complaint, Mr. Bartold is the owner and occupant of 260 Rockwell

Avenue, Stratford, Connecticut, which was deeded to him by his mother in 2005 and was

unencumbered by any mortgage liens.  Mr. Bartold is in his seventies, has disabilities, and relies

on a fixed income consisting of monthly Supplemental Security Income benefits paid by the

Social Security Administration.  In 2009, Mr. Bartold saw a television commercial advertising a

"reverse mortgage" home loan.

A reverse mortgage, or Home Equity Conversion Mortgage ("HECM"), "is a means by

which an individual, usually an elderly person, may borrow on the equity of his or her home, and

the lender pays out so much of the loan proceeds as necessary, in agreed periodic installments over the individual's lifetime.  The mortgage debt becomes due when the borrower either sells the property or dies, whichever occurs first."  *Wolfert ex rel. Estate of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 166–67 (2d Cir. 2006).  These loans are federally insured by the United States Department of Housing and Urban Development ("HUD") and are subject to HUD regulations.  Federal regulations provide for five payment plans through which a borrower can elect to receive their cash payments: (1) tenure; (2) term; (3) line of credit; (4) modified tenure; and (5) modified term.

Generally, "[u]nder the tenure payment option, equal monthly payments are made by the mortgagee to the mortgagor as long as the property is the principal residence of the mortgagor," 24 C.F.R. § 206.19(b), while "[u]nder the term payment option, equal monthly payments are made by the mortgagee to mortgagor for a fixed term of months chosen by the mortgagor," 24 C.F.R. § 206.19(a).  "Under the line of credit payment option, payments are made by the mortgagee to the mortgagor at times and in amounts determined by the mortgagor as long as the amounts do not exceed the payment amounts permitted by" federal regulation.  24 C.F.R. § 206.19(c).  The modified tenure plan combines the features of the tenure and line of credit plans, while a modified term plan combines the features of the term and line of credit options. *See* 24 C.F.R. §§ 206.17(a), 206.25(d).

Mr. Bartold believed that a reverse mortgage loan could enable him to convert the equity in his home to monthly cash payments without having to move out or make monthly loan payments, and that he could receive these payments as long as he was alive and remained living in the home.  Desiring to live independently as long as possible, but facing the cost-prohibitive prospect of continuing to live in his home on his fixed income, Mr. Bartold applied for a reverse

mortgage loan from Webster Bank in early summer 2009.  It was very important to him that he be paid on a tenure plan rather than a term plan, so that he would continue receiving payments throughout his life while he lived in his home.

Webster Bank allegedly approved Mr. Bartold for a tenure plan reverse mortgage based on an appraisal of $185,000, and a closing was scheduled for late July 2009.  Shortly before closing, a real estate agent allegedly advised Mr. Bartold to contact other banks to see if they could offer more favorable loan terms.  Mr. Bartold contacted Wells Fargo, and, in late July 2009, James McMinn, a mortgage broker employed by Wells Fargo, met with Mr. Bartold and told him that Wells Fargo could offer him a reverse mortgage with a 0.5% lower interest rate and larger monthly payments, that it could use Webster Bank's home appraisal of $185,000, and that closing could occur within one month, in late August 2009.  Based on these representations, Mr. Bartold agreed to obtain a reverse mortgage from Wells Fargo instead of following through on his scheduled closing with Webster Bank.

Wells Fargo allegedly did not schedule a closing until October 26, 2009, and this delay required Mr. Bartold to obtain a second home appraisal, based upon which Wells Fargo valued the house at $175,000.  At the closing, Mr. Bartold and Wells Fargo entered into a Home Equity Conversion Loan Agreement (the "Loan Agreement"), and Mr. Bartold executed a Home Equity Conversion Mortgage Payment Plan in which he allegedly elected a modified tenure plan that would pay him $600 per month.  Mr. Bartold began receiving $600 monthly payments from Wells Fargo in November 2009.

Approximately one year later, Mr. Bartold noticed that the monthly statements he was receiving from Wells Fargo indicated his HECM payments were being made based on a modified term plan.  He contacted Wells Fargo several times thereafter to inquire whether his

monthly payments were being made on the modified tenure schedule he believed he had elected. During these telephone conversations, Wells Fargo allegedly repeatedly informed Mr. Bartold that the monthly payments were being made on a modified term schedule, and further told him that this schedule meant that Wells Fargo would only make monthly payments of $600 to him for approximately thirteen years from the closing of the loan, after which Wells Fargo would no longer make any payments to Mr. Bartold.  Mr. Bartold allegedly repeatedly responded that Wells Fargo had made an error, and that he and Wells Fargo had agreed to a modified tenure schedule that would pay him $600 monthly for life, so long as he lived in the property.  He also allegedly told Wells Fargo that he would never have agreed to a reverse mortgage if it meant he would only receive monthly payments for a set limited number of years.  However, Wells Fargo allegedly continued to insist that Mr. Bartold was not entitled to payments on a modified tenure schedule.

Instead, Wells Fargo allegedly told Mr. Bartold that his only option to continue receiving monthly payments beyond the term was to reduce his monthly payment amount, and that he could receive $500, instead of $600, monthly payments to extend the payment term to 16 years. Mr. Bartold told Wells Fargo in May 2011 that he would agree to a reduction in his monthly payments to $500 in order to extend the number of years that he could receive payments.  In May 2011, Mr. Bartold signed a "Change of Payment Plan" form prepared by Wells Fargo that stated that Mr. Bartold was electing to change his payment plan from modified term to modified term. Wells Fargo charged a "recalculation fee" for this change.

Beginning June 2011 and continuing through the present, Wells Fargo has paid Mr. Bartold $500 per month, though Mr. Bartold allegedly has continued to contact Wells Fargo regularly to explain that he had elected a modified tenure payment schedule and to request that

4

Wells Fargo pay him accordingly.  Wells Fargo allegedly continued to fail either to service the loan correctly in accordance with the loan documents or to represent the terms of the loan correctly, while nevertheless charging Mr. Bartold a $30 monthly service fee.

In response to Mr. Bartold's continuing inquiries, Wells Fargo mailed him a copy of his loan documents in December 2013.  These documents stated that Mr. Bartold had elected the modified tenure payment schedule.  Thereafter, Mr. Bartold once again called Wells Fargo to inform it that his loan documents specified he was supposed to be on a modified tenure schedule. In response, Wells Fargo allegedly initially insisted that the loan documents had Mr. Bartold on a modified term schedule, but after allegedly being pointed to the specific language in the loan documents, Wells Fargo allegedly acknowledged that Mr. Bartold was supposed to have been on a modified tenure schedule.  At that point, Mr. Bartold allegedly requested that Wells Fargo make payments to him according to the terms of the loan documents.  Wells Fargo allegedly stated that it would get back to him in approximately two weeks and terminated the call.

Wells Fargo allegedly never called back.  Instead, Mr. Bartold allegedly once again had to contact Wells Fargo, which this time allegedly informed him that, regardless of what was written on the loan documents, Wells Fargo would only pay Mr. Bartold $430 per month if he changed his payment schedule to modified tenure.

Mr. Bartold filed a complaint dated May 12, 2014, in Connecticut Superior Court, which was served on Wells Fargo on May 14, 2014.  On June 13, 2014, Wells Fargo filed a notice of removal [Doc. No. 1] with this Court.  Wells Fargo then filed this motion to dismiss.

## DISCUSSION

### I.      Legal Standard

A motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., is

designed "merely to assess the legal feasibility of a complaint, not to assay the weight of

evidence which might be offered in support thereof." *Official Comm. of Unsecured Creditors of

Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (citations

omitted). When deciding a Rule 12(b)(6) motion to dismiss, a court must accept the material

facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and

decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556

U.S. 662, 678-79 (2009); *Twombly*, 550 U.S. 544, 555-56 (2007); *In re NYSE Specialists Sec.

Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555,

570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678. Although "detailed factual allegations" are not required, a complaint must offer

more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of

action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at

555, 557 (2007). Plausibility at the pleading stage is nonetheless distinct from probability, and

"a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the

claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal

quotation marks omitted).

## II.      Count I: Violations of CUTPA

Defendant argues that Plaintiff's CUTPA claim with respect to the origination of the

reverse mortgage should be dismissed because it is time-barred. Defendant further argues that

Plaintiff's CUTPA claim should be dismissed in its entirety because the complaint fails to allege "substantial aggravating circumstances."

**A.    Statute of Limitations**

An action for damages under CUTPA "may not be brought more than three years after the occurrence of a violation of [CUTPA]." Conn. Gen. Stat. § 42-110g(f). Defendant argues that two distinct portions of Plaintiff's CUTPA claim are time-barred in this case. First, Defendant argues that, because the reverse mortgage in this case closed on October 26, 2009, the statute of limitations for any CUTPA violation related to the origination of the loan expired on October 26, 2012. Second, Defendant argues that, because it allegedly first misrepresented Plaintiff's payment plan as modified term in November 2009, any CUTPA claim predicated on Defendant's failure to make payments according to a modified tenure plan expired in November 2012. At this stage of this case, Defendant's arguments fall short.

"The statute of limitations is an affirmative defense, and therefore generally not appropriate for a motion to dismiss." *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-cv-282, 2012 WL 162361, at *3, 2012 U.S. Dist. LEXIS 6233, at *8 (D. Conn. Jan. 18, 2012). "A statute of limitations analysis is generally riddled with questions of fact which *the Defendants* must establish in order to bar Plaintiffs' claims. . . . Accordingly, unless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development." *Allen v. Dairy Farmers of Am., Inc.*, 748 F.Supp.2d 323, 354 (D. Vt. 2010); *see also OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 503 (D. Conn. 2007) ("A statute of limitations defense . . . requires a factual inquiry beyond the face of the complaint."). Only where the dates in a complaint clearly show that an action is barred by a statute of limitations may a defendant raise the affirmative defense

in a pre-answer motion to dismiss. *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989); *see also Healthcare Strategies*, 2012 WL 162361, at *3, 2012 U.S. Dist. LEXIS 6233, at *8 ("Where, as here, a complaint does not demonstrate facial infirmity with respect to the statute of limitations, a motion to dismiss on this ground must fail."); *Slainte Investments Ltd. P'ship v. Jeffrey*, No. 3:14-cv-01750, 2015 WL 6692242, at *9-10, 2015 U.S. Dist. LEXIS 148682, at *29 (D. Conn. Nov. 3, 2015) ("In short, a motion to dismiss may be granted if a complaint's allegations affirmatively establish an action's untimeliness, but it may not be granted simply because a complaint failed to include allegations affirmatively establishing its timeliness."); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("Because the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run.") (internal quotation marks and citations omitted); *Ortiz v. City of New York*, 755 F. Supp. 2d 399, 401-02 (E.D.N.Y. 2010) ("District courts, however, have not dismissed actions as untimely on Rule 12(b)(6) motions unless the complaint shows *clearly* that a claim is not timely.") (internal quotation marks and citation omitted).

The Connecticut Supreme Court "has recognized that under certain circumstances, the limitations period may be tolled under the continuing course of conduct doctrine." *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (citing *Blanchette v. Barrett*, 229 Conn. 256, 265 (Conn. 1994). Specifically, the Supreme Court has

> recognized two general categories in which the continuing course of conduct doctrine has tolled, or theoretically could toll, the statute of limitations. One category may be satisfied when an initial act or omission occurs, and a special relationship creates an ongoing duty to correct or otherwise ameliorate the wrong. A second general category addresses situations in which, because of a continuous course of contacts or dealings, it cannot be said with precision when a specific act or omission occurred in the course of the

relationship.  In this situation, the statute may be tolled until the time of the last act within
the course of the relationship.  There may, of course, be scenarios which analytically fit
both categories.

*Partitions, Inc. v. Blumberg Assocs.*, No. CV980576664S, 2001 WL 1332174, at *3, 2001 Conn.

Super. LEXIS 2960, *9-10 (Conn. Super. Ct. Oct. 9, 2001) (citations omitted).  "The continuing

course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are

premature because specific tortious acts or omissions may be difficult to identify and may yet be

remedied."[1]  *Blanchette*, 229 Conn. at 276.

　　　"Connecticut courts have applied the continuing course of conduct doctrine to toll the

CUTPA limitations period."  *Independence Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F.

Supp. 2d 183, 190 (D. Conn. 2007).  For the CUTPA claim in this case to fall within the three-

year limitations period, "deceptive practices, or a continuing course of deceptive conduct, by

[Defendant]," *id.*, must have occurred on or after May 12, 2011, which is when the statute of

limitations on Plaintiff's CUTPA claim began to run.

　　　Asserting a statute of limitations defense in a pre-answer motion to dismiss is especially

difficult where a continuing course of conduct might apply, as "[t]he continuing course of

conduct doctrine is 'conspicuously fact-bound.'"  *Id.* at 188 (quoting *Blanchette*, 229 Conn. at

276).  In this case, it is not plain on the face of the complaint that the continuing course of

conduct doctrine does not apply to toll the statute of limitations.  As previously referenced, one

general category in which the continuing course of conduct doctrine would apply to toll a

CUTPA claim after the cessation of the alleged wrongful act or omission is where "there has

---

[1] Viewing the allegations in the light most favorable to Plaintiff, it appeared that the tortious act of misrepresenting
the payment plan could yet be remedied, thus rendering a lawsuit premature, through December 2013, when
Defendant finally admitted its misrepresentation and still refused to correct its alleged misconduct.  At the very least,
it is plausible from the complaint that a lawsuit may have been premature until May 2011, within the limitations
period, when Defendant allegedly coerced Plaintiff into reduced monthly payments based on Defendant's
misrepresentations, as that was arguably the first time there was an "ascertainable loss" as a result of those
misrepresentations.

been evidence of . . . some later wrongful conduct of a defendant related to the prior act." *Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 204 (D. Conn. 2007) (quoting *Zielinski v. Kotsoris*, 279 Conn. 312, 322 (Conn. 2006) (internal quotation marks omitted)).

In this case, Plaintiff has alleged later wrongful acts related to the alleged deceptive acts occurring prior to the limitations period.  For example, as part of his CUTPA claim, Plaintiff alleges that at the time of the closing, Defendant misrepresented the terms of the loan and unjustifiably delayed closing, reducing the monthly payments he would otherwise have received. Similarly, Plaintiff alleges that within the limitations period, Defendant further misrepresented the terms of the loan, which resulted in further reducing his monthly payments.  Therefore, the motion to dismiss will not be granted on this basis.  *See, e.g.*, *Aldrin v. Kaufman Fuel Co.*, No. CV860235243S, 1990 WL 265360, at *3, 1990 Conn. Super. LEXIS 1970, at *6 (Conn. Super. Ct. Dec. 14, 1990) (continuous course of conduct brought defendant within statute of limitations on CUTPA claim where, as part of alleged violation of CUTPA, agreement entered into prior to limitations period required plaintiffs to purchase oil from defendant and defendant supplied the required oil into the limitations period); *Partitions, Inc.*, 2001 WL 1332174, at *6, 2001 Conn. Super. LEXIS 2960, at *17-18 (statute of limitations tolled for CUTPA claim under continuing course of conduct where alleged wrong was omission to ask about a rating, even though the rating was given outside the limitations period); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (finding allegations that defendant directed marketing strategy to minors for over forty years sufficiently alleged continuing course of conduct to toll statute of limitations for CUTPA claim).

Defendant's motion to dismiss some or all of Plaintiff's CUTPA claim based on the statute of limitations is therefore denied.

### B.      Failure to State a Cognizable CUTPA Claim

CUTPA provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages," punitive damages, and equitable relief.  Conn. Gen. Stat. § 42-110g(a).  "To determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's 'cigarette rule[.]'" *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007).

> The factors to be weighed under the cigarette rule are (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 119-20 (2d Cir. 2004) (internal quotation marks and citation omitted).  "All three criteria do not need to be satisfied to support a finding of unfairness."  *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350 (2010) (internal quotation marks and citation omitted).

Defendant does not argue that Plaintiff's allegations fail to state a CUTPA claim under analysis of the cigarette rule factors.[2]  Rather, Defendant's position is that because some (though

---

[2] This may be because the allegations in the complaint appear to satisfy all three factors of the cigarette rule.  For example, the alleged acts by Defendant offend public policy as embodied by federal statutes and regulations governing HECM loans.  *See, e.g.*, 12 U.S.C. § 1715z-20 (purpose of HECM mortgages is "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at a time of reduced income"); 24 C.F.R. § 206.201(b) ("The paramount servicing responsibility is the need to make timely payments in full as required by the mortgage.  Any failure of a mortgagee to make all payments required by the mortgage in a timely manner will be grounds for administrative sanctions[.]").  The alleged acts viewed in the light most favorable to Plaintiff would also constitute immoral, unethical, oppressive, or unscrupulous conduct—for example, Defendant is alleged to have repeatedly

not all) Connecticut courts have held that a CUTPA claim predicated on a breach of contract requires "substantial aggravating circumstances attending the breach of contract," *Eclipse Sys., Inc. v. Harrell*, No. MMXCV106003857S, 2011 WL 2480405, at *2, 2011 Conn. Super. LEXIS 1319, at *6 (Conn. Super. Ct. May 25, 2011), Plaintiff's CUTPA claim must be dismissed for a lack of such circumstances.  The Court disagrees.

Even if this CUTPA claim were to sound in breach of contract and even if the pleading of "substantial aggravating circumstances" were the controlling standard for stating such a claim, Plaintiff has satisfied that standard.  "Conduct that has been held to be substantial aggravating circumstances sufficient to support CUTPA claims includes fraudulent representations, fraudulent concealment, false claims[,] and multiple breaches of contract[.]"  *Reich v. Spencer*, No. HHDCV075012682S, 2010 WL 5573735, at *21, 2010 Conn. Super. LEXIS 3255, at *59-60 (Conn. Super. Ct. Dec. 10, 2010) (citations omitted).  "Negligent misrepresentation suffices . . . as an aggravating factor making a breach of contract action also the basis of a CUTPA claim." *Romulan Realty, LLC v. Old Lyme Prods., Inc.*, No. CV115014161S, 2011 WL 6934754, at *2, 2011 Conn. Super. LEXIS 3119, at *7 (Conn. Super. Ct. Dec. 7, 2011) (internal quotation marks and citation omitted).  Plaintiff has alleged facts that could establish Defendant made fraudulent and negligent misrepresentations that caused Plaintiff damages.  Therefore, even under a breach of contract theory of CUTPA liability, Plaintiff adequately has pleaded the substantial aggravating circumstances arguably necessary to state such a claim.[3]

---

given Plaintiff false information in response to Plaintiff's inquiries, used those false representations to coerce Plaintiff to accept less money than he was owed, and then after the misrepresentation was finally disproven, Defendant refused to correct its error, instead attempting to coerce Plaintiff into further reducing his monthly payments.  Finally, the allegations in the complaint indicate that Plaintiff has suffered substantial injury as a result of Defendant's conduct; for example, he alleges that as a disabled and elderly person on a fixed income, Defendant's reduction of his monthly payments by one-sixth have seriously jeopardized his financial security and rendered him unable to cover his basic living expenses.

[3] Defendant made this same argument in a recent case in this district, and it was likewise rejected there.  *See Davis v. Hunt Leibert Jacobson, P.C.*, No. 3:12-cv-1102, 2014 WL 5798585, at *6, 2014 U.S. Dist. LEXIS 157693, at *17-

### III.    Count II: Breach of Contract

Defendant argues that Plaintiff has failed to allege a breach of contract.  The complaint, however, alleges that, at the outset of the reverse mortgage, Wells Fargo, unilaterally and without notice to or permission from Mr. Bartold, changed the payment plan from modified tenure to modified term, which violates section 2.8.5 of the Loan Agreement ("Changes in the payment plan must be acknowledged by Borrower by signing a form containing the same information as the attached payment plan (Exhibit 1).").  The complaint further alleges that Defendant has on multiple occasions refused Plaintiff's requests to properly calculate his monthly payments, thus breaching its obligations under sections 2.5, 2.7, and 2.8 of the Loan Agreement.  Another allegation in the complaint is that Defendant began paying Plaintiff only $500 monthly beginning in June 2011, rather than the $600 Defendant was required by the Loan Agreement to pay.

Accepting all factual allegations as true and drawing all reasonable inferences in favor of Plaintiff, the May 2011 "Change of Payment Plan" document signed by Mr. Bartold could be determined to be void on various grounds,[4] and thus the terms of the original Loan Agreement could remain in effect.  *See Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) ("Void contracts produce no legal obligation.") (internal quotation marks and citation omitted).

---

18 (D. Conn. Nov. 7, 2014) (noting that "Wells Fargo next contends that Plaintiff has alleged only a simple breach of contract that is not covered by CUTPA," yet holding that "Plaintiffs have plausibly alleged that Wells Fargo's conduct . . . constitutes 'unethical, oppressive, or unscrupulous' behavior under CUTPA").

[4] For example, under the terms of the Loan Agreement, Mr. Bartold had the right to $600 monthly payments for life. Then in May 2011, Wells Fargo offered to continue to make monthly payments to Mr. Bartold in the years 2023 through 2025 if he would agree to accept $500 instead of $600 per month.  However, Wells Fargo had already given Mr. Bartold a right to monthly payments for those years in the Loan Agreement.  "Such 'past consideration'—action already taken before a promise is made—cannot be consideration for the promise."  E. Allen Farnsworth, *Farnsworth on Contracts* § 2.7 (3d ed. 2004).  Another possible grounds for finding the Change of Payment Plan void is the allegation that Wells Fargo misrepresented the existing terms of the Loan Agreement.  "[T]he effect of such a misrepresentation is that there is no contract at all[.]"  *Id.* § 4.10.

Based on the foregoing, the Court concludes that Plaintiff has stated a claim for breach of contract, and thus denies the motion to dismiss Count II of the complaint.

## IV.     Count III: Negligent Misrepresentation

Defendant argues that Plaintiff's negligent misrepresentation claim is time barred. "Under Connecticut law, a three-year statute of limitations applies to actions based upon misrepresentation and fraud." *Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 377-78 (D. Conn. 2013) (citing Conn. Gen. Stat. § 52–577).  At a minimum, the complaint alleges a misrepresentation occurring in approximately December 2013, which is within the applicable statute of limitations period.[5]  As a result, this claim will not be dismissed at this time.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss [Doc. No. 14] is **DENIED**.

SO ORDERED at Bridgeport, Connecticut, this 24th day of November, 2015.

      /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[5] In addition, "the [Connecticut] Supreme Court has implied that an affirmative misrepresentation is 'continuing wrongful conduct' as a matter of law," *Evans v. Province*, No. CV07600855, 2008 WL 3916445, at *6, 2008 Conn. Super. LEXIS 1946, at *17 (Conn. Super. Ct. Aug. 4, 2008), meaning that the continuing course of conduct doctrine would toll the statute of limitations for even the misrepresentations occurring more than three years before the filing of the complaint.